IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA
Plaintiff

vs

JULIO A. DE SANTIAGO-ACOSTA
Defendant

CRIMINAL 15-0614CCC

**OPINION AND ORDER: SUPPRESSION/
FOURTH AMENDMENT/BREATH TEST**

**I.   PROCEDURAL BACKGROUND**

Defendant Julio A. de Santiago-Acosta (De Santiago) filed a Motion to Suppress Evidence (d.e. 17) seeking exclusion of "all physical evidence, testimonial evidence, and statements attributed to Mr. De Santiago resulting from the stop, excessive detention, and illegal search of Mr. de Santiago's vehicle by law enforcement officers." Motion, at p. 1.  The Motion to Suppress Evidence and the United States' Response in Opposition (d.e. 20) were referred to the U.S. Magistrate-Judge for a hearing and report and recommendation (d.e. 21).  While a Report and Recommendation was issued by U.S. Magistrate-Judge Camille L. Vélez-Rivé (d.e. 56) recommending that the Motion to Suppress Evidence be granted, the Court did not adopt it (d.e. 66).  Instead, it scheduled a de novo hearing to hear the testimonies of P.R. Police Officer José A. Montalvo and defendant De Santiago, both of whom had originally testified before the U.S. Magistrate-Judge.  The two-day de novo hearing was held on February 14 and March 1, 2017.  Post-hearing briefs were filed by the United States (d.e. 104) and defendant De Santiago (d.e. 105).

CRIMINAL 15-0614CCC         2

Having read the February 14, 2017 and March 1, 2017 transcripts of the de novo hearing that contain the entire testimony of the only two witnesses, Police Officer Jose A. Montalvo and defendant Julio A. De Santiago, having carefully assessed the witnesses' credibility and having examined the de novo hearing exhibits and the parties' memorandums post de novo hearing in support and in opposition to suppression (d.e. 104 and d.e. 105), the Court makes the following:

**II.     FINDINGS OF FACT ON WARRANTLESS BREATHALYZER SEARCH**

(1)    Officer José A. Montalvo has been assigned to the Buchanan Highway Patrol for approximately 17 of the 20 years during which he has worked for the Puerto Rico Police Department (PRPD).  He described his duties as participating in preventive patrols, vehicular interventions, car accident investigations and interventions with drivers under the influence of intoxicating substances.  Since the year 2003, he has received training and been certified several times in the use of breathalyzers.  The training includes functioning of the device, a 5000ANA breathalyzer machine, operation of the device itself, and courses given by a lawyer that include identifying characteristics of a driver operating a vehicle under the influence, such as reddish eyes, manner of speaking, flushed or reddish face, and in many cases breath odor.  He testified that he had performed hundreds of traffic interventions based on drunk driving.

(2)    On September 20, 2015, he was on duty.  While on patrol from the Minillas Tunnel, San Juan to Bayamon, he performed a traffic stop around 9:00 P.M. after observing to his left the driver of a 2003 white Toyota Corolla who was using his cell phone. Defendant conceded that a reasonable officer could

CRIMINAL 15-0614CCC         3

have had reasonable suspicion to justify the original stop based on illegal use of the cellphone. The officer used the siren to order the driver to stop. The intervention occurred at the expressway after defendant parked in the shoulder of the road. The officer stopped the patrol car behind his vehicle and kept the lights on during the entire time of the intervention. The area was illuminated by lampposts and by bright lights from portable trailers in a nearby construction area.

    (3)    The police officer requested the driver's license and car registration and informed him that the reason for stopping him was his use of a cellphone while driving. Agent Montalvo observed as defendant was looking for his documents that he reached for a bag, opened the bag and placed both hands inside it. He testified that defendant "turned towards the bag on the front passenger seat to look inside it." Transcript March 1, 2017 hearing (TR. 3/1/17), p. 23, lines 9, 15, 17. The Court then directed the officer to "stand and show where [defendant] took the documents out from the bag," to which he answered "from this area which at that point in time was open." TR. 3/1/17, p. 27, lines 6-9. Upon observing his demonstration as to where the defendant took the documents out from the bag, the Court stated: "… that's the whole bag open." TR. 3/1/17, p. 27. Officer Montalvo's full description of defendant's search for the documents was that: "he turned towards the bag to look inside it and gave them to me… he proceeded to open it, put his hands in it and search through this brown bag … he found the documents … gave them to me after rifling through it [referring to the bag] he pulled out the documents and handed them to me." Transcript February 14, 2017 hearing (TR. 2/14/17), pp. 56-57. The bag from which defendant took out the driver's license and the

car registration was admitted as Government Exhibit 2.  After retrieving the car documents, defendant left the bag in the same position, on the front passenger seat, leaning against the seat back.  TR. 2/14/17, p. 59.

    (4)   Officer Montalvo observed defendant's movements while he was looking for the documents, adding that "I was able to observe the entire area close by the driver and that while I intervened with him, I was able to observe, looking at him, that his face appeared to be flushed, his eyes, when I observed him, looked bloodshot… in addition … inside the vehicle in the area of the console there was a plastic glass, transparent, that had a liquid beverage that looked to be quite clear which I thought could be an alcoholic beverage."  TR. 2/14/17, p. 60.  He described the beverage as having "a hint of color, like sort of pinkish."  TR. 2/14/17, at p. 61.  He repeated that these signs led him to understand that defendant was driving under the influence and he then ordered the breathalyzer.  At one point he testified that when he saw the beverage he thought "that he could be a driver suspicious of operating a vehicle under the influence of an intoxicating beverage based on the cup and the way his eyes were bloodshot."  Id.  Asked whether the defendant talked to him during the intervention, he answered "yes … I could barely understand what he was saying to me, it was somewhat slurred," using the word "trabado" in Spanish.  TR. 2/14/17, pp. 61-62.  Asked to explain what he meant by "trabado" when he described defendant's speech in Spanish, he answered: "like he wasn't speaking fluently, like the words were like caught off … I was able to understand what he wanted to say a little bit."  TR. 2/14/17, pp. 63, lines 3-4, 12-13.  He explained that defendant spoke "after handing over the documents."  TR. 2/14/17, p. 63, lines 16-17, and that he was in the driver's

seat with the driver's window down.  The officer had observed defendant from the moment he asked for the documents and while defendant searched for and produced them.  TR. 2/14/17, p. 64.  He then commented to defendant that he looked suspicious of DUI.  It was then that defendant spoke to him for the first time.  In sum, upon observing the red/bloodshot eyes/red face/slurred-speech and beverage in a cup next to him, the officer understood that defendant could be driving under the influence of alcohol.  TR. 2/14/17, p. 67.

(5)    He then instructed defendant to step out of the car.  Once they were both by the right side of the car, by the front passenger door, he showed defendant the equipment and explained how to blow into it to perform the breath test.  TR. 2/14/17, p. 75.  The officer explained that the defendant was standing across from him and "that he was right up against the front-passenger door because the area between the vehicle and the metal barrier was quite narrow;" that he was "up to the door, I was completely up against it, not even a foot … not even a foot away from the vehicle door."  TR. 2/14/17, p. 74.

(6)    The Court gives credence to the events that unfolded, as testified to by officer Montalvo, while he was waiting for the breathalyzer results.  The relevant portions of his testimony follow:

A.    Once he blows into it and I'm standing up against the vehicle, I observed the inside of the vehicle.

Q.    How was the window of the front passenger.

A.    It was down.

Q.    Completely down?

A.    Yes, completely down, as it was from the moment I was able to observe him operating the cellphone.

> Q. When you observed through the front passenger window, what did you see?
>
> A. At that moment, I observed the vehicle, I observe the vehicle ignition; I observed that the vehicle had all of its parts in the interior … and as part of my duty I observed whether the vehicle contained anything illegal in plain sight. What I was able to observe that drew my attention, I observed the bag that was on the passenger seat, it was standing up, like leaning against the seat back.
>
> Q. Agent Montalvo can you please tell us how did you see it leaning against the front passenger seat?
>
> A. The seat was here and it was like leaning but standing up.
>
> Q. Was it completely straight or was it inclined?
>
> A. It was almost straight.
>
> Q. And what about the bag called your attention?
>
> A. That it was open and that inside the bag I was able to observe that it had like what seemed a whole lot of money, just strewn about the inside of the bag.
>
> Q. The money was where?
>
> A. Inside the bag like all just loose and all just strewn about.
>
> Q. In relation to the bag, what was the position of the money and the bag?
>
> A. It was inside, in the pocket inside.
>
> Q. What do you mean by in the pocket, inside?
>
> A. Well, showing the bag, it has the opening above, the hole of the bag where you put the articles. And the way the money was, it was in the bag but it was all like strewn about, and it was there in that part of the bag, and because it was standing I was able to observe it.

TR. 2/14/17, pp. 76-78.

At this point, utilizing the purse admitted into evidence as Exhibit 2, the undersigned questioned Montalvo whether he saw the money in an outside

back pocket with a zipper, an outside front pocket with a zipper, an inside pocket with a zipper or in two small interior pockets without zipper. He answered "no" as to all five "pockets." TR. 2/14/17, pp. 78-80. When asked where exactly he saw the money, he answered "in that large one of the opened bag because it was a lot of money and it was right up to the edge, it was practically coming out of the purse." Asked whether all the money was in the interior of the purse, in the big hole, he said: "yes, in the upper portion." TR. 2/14/17, p. 81. The parties stipulated that the amount of currency inside the bag were 87 bills and that the stipulated amount of the currency was $1,001.00. Officer Montalvo further testified:

> Q. After you see these monies coming out from the bag, what did you do, Agent Montalvo?
>
> A. I looked more thoroughly.
>
> Q. Where? Where did you look more thoroughly?
>
> A. The area where the money was.
>
> Q. Okay. And did you see anything else?
>
> A. Yes, I did.
>
> Q. What did you see?
>
> A. I saw something shiny that was over that money.
>
> Q. Could you determine what object was that, or that something shiny, what was it?
>
> A. Yes, it was a bullet.
>
> Q. Can you describe that bullet?
>
> A. Yes. It was -- the lead was gray, dark gray, more or less, and the shell casing was like golden.
>
> [That bullet was admitted as Exhibit No. 22.]

CRIMINAL 15-0614CCC                8

. . . .

Q. Agent Montalvo, what is the exhibit that I just handed to you?

A. Some bullets.

Q. Can you look at them, please, and tell us if you recognize those bullets?

A. Yes.

Q. Can you describe those bullets?

THE COURT: Well, how many bullets, to start with, in that plastic bag?

A. Seven.

THE COURT: Seven bullets. Are they different or are they all similar?

A. They are the same.

THE COURT: Describe them.

A. It's a bullet for a revolver, with lead at the tip, which is gray, and the casing which is rather large and it's a gold color, .38 caliber.

TR. 2/14/17, pp. 87-89.

When the officer saw the bullet, the breathalyzer device clicked and a zero result appeared on the screen. It is reasonable to believe that the items found inside the bag (Exhibit 21) which included, among others 87 dollar bills, were propping the bullet up in the upper part of the open bag, that was placed almost straight against the back of the front passenger seat. This made the bullet visible to Officer Montalvo who explained that he "saw something shiny that was over the money" and described it as a dark gray bullet with a golden-like shell casing.

      This was the scenario when Officer Montalvo stood next to the right front passenger door, with the glass window down, while he waited for defendant to blow into the breathalyzer machine.  When the test concluded, he put the breathalyzer away.  When he went to pick the bullet from the purse, he noticed a ziplock bag with white powder that appeared to be cocaine.  TR. 2/14/17, pp. 91-92.  He then pulled up the ziplock bag and the bullet fell further down inside the purse and below the money.  Montalvo then turned the purse upside down over the right passenger seat.  At this point, the money, a black revolver with a cream colored grip, two bullets and documents dropped out of the purse.  TR. 2/14/17, p. 93.  Once Officer Montalvo found the revolver, defendant was placed under arrest and transferred with all the items seized and the vehicle to the police station at Buchanan Highway Headquarters.

      An inventory of the seized personal property was admitted as Exhibit 23.  Montalvo testified that the inventory list included more items than those he saw when he turned over defendant's bag.  These personal items, included in Exhibit 23, were described by him as a concert ticket, a health plan card, a cigarette pack and lighter, and small change.  The weapon, described as a .38 caliber revolver in government's Exhibit 2, the inventory of contraband property seized from defendant De-Santiago Acosta on September 20, 2015, was admitted at the hearing as Exhibit 24.  The United States requested that the undersigned assess the weight of the weapon.  The evidence bag pertaining to the revolver was marked as Exhibit 24A.  He identified Exhibit 24 as "the revolver that fell out of the bag when I turned it upside down over the front passenger seat of the white Toyota Corolla driven by defendant." TR. 2/14/17, p. 104, lines 12-17; p. 105, lines 16-17.  Officer Montalvo testified

that at the moment that he turned over the bag and the revolver fell out it was loaded and that he knows it because he took it in his hands, after turning the bag over, and unloaded it when he was next to the passenger door. TR. 2/14/17, p. 105, line 23 through p. 106, line 14.  In addition to the first bullet, the witness testified that there were five bullets "with which the revolver was loaded and one more that was loose inside the purse which he saw when he turned the purse upside down and it fell out."  TR. 2/14/17, p. 108, lines 9-12, lines 15-19.

In addition to the revolver, the inventory of property seized from the defendant that night, government exhibit 2, includes the following items: 7 rounds of .38 caliber ammunition, one scale, 10 Newport cigarettes, one lighter, two bags with white powder, 83 clear baggies (6X1), one spatula, one clear bag with an apple logo, 45 $20 bills, one $100 bill, 4 $10 bills, 6 $5 bills and 31 $1 bills, 52 coins and one telephone.

There is a third vehicle inventory, government exhibit 25(2), which indicates that the 2003 Toyota Corolla was seized from Julio A. Santiago-Acosta on September 20, 2015 and returned to his mother, Gladys Acosta-Reyes on September 21, 2015 (Exhibit 25(2)).  At page 3 next to the listing for "evidence found in the vehicle" it indicates the following: "money, drugs, weapon."  None of the inventories of property seized (Government's Exhibits 2, 23 and 25(2) list a t-shirt.  It is significant that Exhibit 23 is the one that includes an inventory of personal items seized from the defendant, such as, a cigarette pack and lighter, a health insurance card, ticket to a concert, and a necklace and bracelet.  The t-shirt that defendant claims he had in the vehicle on September 20, 2017 and which he used to cover the brown bag

where the revolver and the drugs were found is nowhere in this list of personal items returned and received by his mother Gladys Acosta-Reyes.

Based on the Findings of Fact set forth above, the Court makes the following:

### A. FOURTH AMENDMENT ANALYSIS ON BREATHALYZER SEARCH

Defendant repeatedly asserts what is a settled premise: that a breath test is a Fourth Amendment search. He then embarks on the discussion of the probable cause requirement as the only basis for his challenge to the warrantless breathalyzer search conducted in this case. However, as observed by the Supreme Court in <u>Skinner v. Railway Labor Executives' Ass'n</u>, 489 U.S. 602, 618 (1989):

> To hold that the Fourth Amendment is applicable to the drug and alcohol testing … is only to begin the inquiry into the standards governing such intrusions … for the Fourth Amendment does not proscribe all searches and seizures but only those that are unreasonable."

The <u>Skinner</u> opinion broadly discusses the exceptions to the rule that a search or seizure is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause. Recognized exceptions apply, for example, "when 'special needs, beyond the normal need for law enforcement make the warrant and probable-cause requirement impracticable.'" If such special needs exist, then the practicality of the warrant and probable-cause requirement in the particular context is assessed by balancing legitimate governmental interests against the individual's Fourth Amendment privacy interests.

In <u>Skinner</u>, the Court concluded that the government's interest to ensure safety presented 'special needs' beyond the normal need for law enforcement which justified a departure from the usual warrant and probable-cause requirements. The special need there identified was the government's interest to prevent accidents and casualties that resulted from impairment of (railroad) employees by alcohol or drugs. That special need was balanced to determine whether it justified the privacy intrusions resulting from toxicological tests absent a warrant. Cognizant that a warrant protects the citizens by ensuring that intrusion into their privacy is authorized by law and limited in scope, and that it also provides the detached scrutiny of a neutral magistrate, the Court, nonetheless, concluded that in the context of the mandatory toxicological testing of railroad employees "a warrant would do little to further these aims" for the circumstances justifying the testing and the limits of the intrusions were specifically defined in the regulations that authorized them. <u>Id.</u>, at p. 622.

<u>Skinner</u> specifically recognized "that the Government's interest in dispensing with the warrant requirement is at its strongest when 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.'" This acknowledgment addresses the practicality of the warrant and probable-cause requirements in the particular context, specifically, in the known situation that alcohol and drugs are eliminated from the bloodstream at a constant rate and, therefore, "blood and breath samples taken to measure whether these substances were in the bloodstream when a triggering event occurs must be obtained as soon as possible" for "the delay necessary to procure a warrant may result in the destruction of valuable evidence." <u>Id.</u>

CRIMINAL 15-0614CCC           13

Skinner also analyzed the degree of intrusiveness resulting from the different tests: breath, blood and urine. It concluded that breath tests were less intrusive than blood tests, stating that: "unlike blood tests, breath tests do not require piercing the skin and may be conducted safely outside a hospital environment and with a minimum of inconvenience or embarrassment. Further, breath tests reveal the level of alcohol in the employee's bloodstream and nothing more … breath tests reveal no other facts in which the employee has a substantial privacy interest." Id., at p. 625. It clearly stated that "we cannot conclude that the administration of a breath test implicates significant privacy concerns." Id.

In balancing the governmental and individuals interest, it addressed the deterrence effect upon those engaged in safety sensitive tasks from using alcohol or drugs in the first place. The deterrent effect of the Puerto Rico statute that authorizes breath tests increases the likelihood that persons will forego using drugs or alcohol knowing that they could be subject to testing.

In sum, the Fourth Amendment analysis of the search in this case resulting from submitting defendant to a breath test requires that the Court determine whether it was reasonable to conduct such test in the absence of a search warrant.

The case of Maryland v. King, 133 S.Ct. 1958 (2013), like every other case involving a breathalyzer, acknowledges that a breathalyzer test is a Fourth Amendment search. What the Court does not state in Maryland v. King is that a breathalyzer, being a Fourth Amendment search, requires probable cause. In the same manner as Skinner, the Court cautions that to say that the Fourth Amendment applies "is the beginning point, not the end of the analysis."

CRIMINAL 15-0614CCC                14

Maryland, at p. 1969. It specifically stated that "[i]In some circumstances, such as 'when faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a **warrantless** search or seizure reasonable.'"  Id. (emphasis ours).  It added that "[t]hose circumstances diminish the need for a warrant, either because 'the public interest is such that neither a warrant or probable cause is required," citing Maryland v. Buie, 494 U.S. 325, 331 (1990), or "because an individual is already on notice, for instance because of his employment, see Skinner, . . . that some reasonable police intrusion on his privacy is to be expected." Id. The Court in Maryland v. King repeats what it had said in Skinner and in other cases: "[t]he need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the interpolation of a neutral magistrate between the citizen and the law enforcement officer."

In Maryland v. Buie, the Court acknowledged that there are "contexts … where the public interest is such that neither a warrant nor probable cause is required."  It gave as an example an on-the-street "frisk" "predicated upon the on-the-spot observation of the officer on the beat – which historically has not been, and as a practical matter could not be, subjected to the warrant procedure."  Buie, at p. 1097.  It concluded that "there is no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." Id.

In Maryland v. King, the search involved the use of a cheek swab to obtain a DNA sample which the Court described as a "minimal intrusion."  In Birchfield, the Court considered the impact of breath tests on an individual's

privacy interest and reiterated what it said in Skinner that breath tests do not "implicate significant privacy concerns," citing Skinner, 109 S.Ct. 1402, and added: "the physical intrusion is almost negligible . . . breath tests . . . entail a minimum of inconvenience." Birchfield, 136 S.Ct. at p. 2176. It described the effort involved as "no more demanding than blowing up a party balloon" and observed that "there is nothing painful or strange about the requirement" of placing the mouthpiece of the device into the individual's mouth." Id., at p. 2177. Referring to the collection of a DNA sample upheld in Maryland v. King, the Court in Birchfield commented that "we have upheld warrantless searches involving physical intrusions that were at least as significant as that entailed in the administration of a breath test." Id. The Court also considered the governmental interest in safety, observing that alcohol consumption is a leading cause of traffic fatalities and injuries and also to governmental interests "in creating effective deterrence to drunken driving." Id., at p. 2179. The essential premise advanced by defendant Santiago-Acosta before the Magistrate-Judge and at his de novo hearing has always been that a finding of probable cause is required for a police officer to conduct a breathalyzer. This theory was adopted by the U.S. Magistrate-Judge throughout her July 20, 2016 Report and Recommendation (d.e. 56) when she expressly concluded that "a breathalyzer test is not a minimally invasive intrusion, it must be supported by probable cause." (Emphasis ours.) That position is contrary to Skinner, Maryland v. King, Maryland v. Buie, and Birchfield v. North Dakota, 136 S.Ct. 2160 (2016).

Puerto Rico, like many other jurisdictions, has adopted an implied consent law. 9 L.P.R.A. section 5249 of the Vehicle and Traffic Law (2000),

which in its relevant part provides that it shall be deemed that every person who drives a motor vehicle on the public highways of Puerto Rico has consented to submit to toxicological testing including physical analysis of his/her breath.  It is further provided at section 5209(a) that it is "understood that said consent has been given for any analysis enacted herein and that the person required to undergo it shall submit to the analysis determined by the law enforcement officer who performed the detention."  If the person intervened refuses the alcohol testing procedure, the statute provides that he shall then be arrested in order to be transferred to a hospital facility where the samples shall be taken.

    The police officer in our case also ordered the search "predicated upon the on-the-spot observation of the officer on the beat." Buie, at p. 1097.  After initially stopping the defendant for using a cell phone while driving, he requested his vehicle registration and driver's license; observed and assessed defendant's behavior and physical characteristics.  He described these as reddish eyes that looked blood-shot, flushed face, a clear beverage in the area of the console perceived by the officer to be an alcoholic beverage and slurred speech, further described as follows: "I could barely understand what he was saying … like he wasn't speaking fluently,  like the words were like cut-off."  Based on these observations, he concluded that there were reasonable grounds to believe that defendant could be driving under the influence of alcohol.

    Defendant challenges the extended detention which based on the officer's observations led to the breathalyzer and requests exclusion of the evidence seized, claiming that the seizure of the revolver and drugs from the

vehicle were the fruit of a tainted prolonged detention. The extended duration, of course, results from conducting the breathalyzer. The authority of the law enforcement officer to order a breath test based on on-the-spot judgments and observations made by him during a stop does not depend on what a judicial officer, whether a judge or a magistrate-judge, may subsequently determine was the probability that the breath test conducted during the traffic stop would in fact reflect intoxication. The 0.00 breath test result in this case cannot be used by the judicial officer to challenge and second-guess the police officer's decision to order the breath test.

Based on the caselaw that assesses the impact of breath testing on the individual's privacy interest as minimally invasive, fully discussed in Skinner, Maryland v. King, and Birchfield, and further considering the balancing of the governmental interest against the interest of the individual in his privacy, the Court finds that the ultimate measure of the constitutionality of a warrantless breathalyzer search, reasonableness, has been met. The circumstances of the search reflect that there is a public interest in conducting warrantless breathalyzers to ensure the safety of the public highways, that there is a special law enforcement need in preventing the loss of blood alcohol evidence as a result of the body's metabolism of alcohol in the blood. There is the deterrent effect on drivers that ensures that they do not become drunken drivers in the first place and that there is a minimal intrusion of the individual's privacy and personal security. All of these circumstances point to the conclusion that the warrantless breath test conducted in this case was a reasonable search within the framework and the requirements of the Fourth Amendment.

### B. SEIZURE OF EVIDENCE SUPPORTED BY THE PLAIN VIEW DOCTRINE

As Officer Montalvo acted within the constitutional parameters of the Fourth Amendment when he administered the breathalyzer test to defendant De Santiago, it follows that he was lawfully positioned while conducting the test to look from the outside into his vehicle. It was precisely while he was waiting for the test results when, according to Montalvo's testimony, to which we give full credence, he observed a bullet on top of the money that was strewn in the defendant's open purse. When he went to pick the bullet from the open purse, he noticed a ziplock bag with white powder which appeared to be cocaine. Both items, the bullet and the ziplock bag with white powder, had an immediate apparent incriminating character. Their seizure was supported by the plain view doctrine, which provides that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately. Texas v. Brown, 460 U.S. 730, 739 (1983). As explained in Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971):

> What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure.

See also United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015) (". . . the plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself.").

CRIMINAL 15-0614CCC                19

     Since the single bullet that Officer Montalvo saw, fell inside the purse when he picked up the ziplock bag, he had the right to retrieve it, which he attempted to do by overturning the purse. At that point, various other items fell from the purse, including two bullets and a loaded revolver, further providing the officer with probable cause to arrest the defendant as he subsequently did.

**III. CONCLUSION**

     Having considered the findings and the analysis stated above, the Motion to Suppress Evidence filed by defendant Julio A. de Santiago-Acosta (**d.e. 17**) is DENIED.

     SO ORDERED.

     At San Juan, Puerto Rico, on June 23, 2017.

                                                      S/CARMEN CONSUELO CEREZO
                                                    United States District Judge